**DAVIS et al. v. SCHNELL et al.**

**Civil Action No. 758.**

United States District Court
S. D. Alabama, S. D.

Jan. 7, 1949.

David R. Landau and George N. Leighton, both of Chicago, Ill., for plaintiffs.

A. A. Carmichael, Atty. Gen. of Alabama, Silas C. Garrett III, Asst. Atty. Gen. of Alabama, E. C. Boswell, of Geneva,

Ala., Ira B. Thompson, of Montgomery, Ala., Kenneth Griffith, of Cullman, Ala., and Carl M. Booth, Circuit Sol., of Mobile, Ala., for defendants.

Before McCORD, Circuit Judge, MULLINS and McDUFFIE, District Judges.

MULLINS, District Judge.

This case was tried before a duly constituted three-judge District Court.

Under the amended complaint, this suit is brought by ten Negro citizens of Mobile County, Alabama, against the Board of Registrars of said County and the individual members thereof, to declare and secure their rights to register as electors. The plaintiffs bring the action on their own behalf, and on behalf of all Alabama citizens similarly situated.

The plaintiffs allege that registration is a prerequisite of the right of a citizen of Alabama to vote in any election, Federal, State or local.[1]

The plaintiffs allege that at a general election held on November 7, 1946, there was submitted to and adopted by the people of Alabama an amendment to Section 181 of the Constitution of Alabama (popularly called and referred to herein as the Boswell Amendment), changing the requirements for registration of electors so that only those persons who can "understand and explain" any article of the Federal Constitution can be registered as electors.[2]

They allege that this amendment was purposely sponsored, its adoption obtained, and its provisions are being administered so as to prevent the plaintiffs and others, because of their race, from exercising their right to vote.

The plaintiffs aver that they appeared before the defendants, members of the Board of Registrars for Mobile County, Alabama, and, acting under color of law, the defendants required the plaintiffs, all members of the Negro race, to explain an article of the Federal Constitution, which they did, and the defendants informed them that the defendants were not satisfied with the explanations given, and refused to register them.

It is further averred that said Section 181, as amended, requiring applicants for registration to "understand and explain" any article of the United States Constitution, together with the provisions of Title 17, Section 33, Code of Alabama 1940,[3] vests in the Board of Registrars unlimited discretion to grant or deny the plaintiffs and others similarly situated the right to register as electors; that said Amendment provides no definite, reasonable or recognizable standard or test to be applied in determining the qualifications of electors; that defendants refused to register plaintiffs and other qualified Negro applicants, while at the same time defendants were registering white applicants with less qualifications; that plaintiffs, solely because of

---

[1] Title 17, Section 12, Code of Alabama 1940, so provides.

[2] Section 181 of the Constitution of Alabama, as amended:

"After the first day of January, nineteen hundred and three, the following persons, and no others, who, if their place of residence shall remain unchanged, will have, at the date of the next general election, the qualifications as to residence, prescribed in section 178 of this article, shall be qualified to register as electors provided they shall not be disqualified under section 182 of this constitution: those who can read and write, understand and explain any article of the constitution of the United States in the English language and who are physically unable to work and those who can read and write, understand and explain any article of the constitution of the United States in the English language

and who have worked or been regularly engaged in some lawful employment, business, or occupation, trade, or calling for the greater part of the twelve months next preceding the time they offer to register, including those who are unable to read and write if such inability is due solely to physical disability; provided, however, no persons shall be entitled to register as electors except those who are of good character and who understand the duties and obligations of good citizenship under a republican form of government." [Amend. No. 55].

[3] Title 17, Section 33, Code of Alabama 1940:

"Any person making application to the board of registrars for registration who fails to establish by evidence to the reasonable satisfaction of the board of registrars that he or she is qualified to register, may be refused registration."

their race and color, were required to make lengthy explanations of articles of the Constitution of the United States, while white applicants were being registered without being required to make any such explanations.

Plaintiffs further allege that they possess all of the qualifications and have none of the disqualifications to register as electors, except that they are unable to comply with or reasonably satisfy the defendants that they can comply with the requirements of the Boswell Amendment, which requirements they aver are void in that they are vague, uncertain, undefined, and provide no discernible standard; that said Amendment, without mentioning either race or color, was adopted for the purpose and with the intent of the proponents thereof to create a scheme to prevent qualified Negroes from voting; that the qualification to "understand and explain" any article of the Constitution is a mere subterfuge designed for the purpose of depriving plaintiffs and others of the right of franchise on account of race or color; that it has become the general and habitual practice of the defendants, acting under color of law, to refuse to register Negro residents of said county, including the plaintiffs, on the pretext that they are unable to "understand and explain" any article of the Federal Constitution. The plaintiffs further allege that they have been denied the right to register as electors solely on account of their race or color.

The plaintiffs aver that an actual controversy exists between the plaintiffs and the defendants within the meaning of Title 28, Section 400, United States Code (now Section 2201 of Revised Title 28, United States Code), in that the plaintiffs contend that Section 181 of the Constitution of Alabama, as amended, is unconstitutional on its face and because of the manner in which it is administered, as being violative of the provisions of the Fourteenth and Fifteenth Amendments and other provisions of the Constitution of the United States while the defendants contend that said Boswell Amendment is constitutional both on its face and in the manner in which it is administered.

Plaintiffs seek a declaratory judgment declaring the Boswell Amendment unconstitutional and ask for injunctive relief against the further enforcement of the provisions of the same. Plaintiffs waived their prayer for damages.

The defendant board and two of the individual members thereof answered the complaint. They deny that the Boswell Amendment is unconstitutional and deny that they administer the registration laws differently as to white and Negro applicants, and aver that they administer the laws fairly to all applicants for registration, without regard to race or color. They admit that the individual defendants compose the Board of Registrars of Mobile County; they admit that at least three of the plaintiffs, Hunter Davis, Julius B. Cook, and Russell Gaskins, applied to the board for registration and were rejected; they aver that the records of the board do not disclose that any of the other plaintiffs ever applied to them for registration, and deny that any application for registration has ever been refused on account of race or color. They admit, and the Court finds, that an actual controversy exists between the plaintiffs and the defendants and that the contentions of the parties with reference thereto are substantially stated in the amended complaint.

E. J. Gonzales, the third member of the defendant board, declined to join in the answer filed by the other defendants, stating that he could not join in all of the denials contained in their answer. He filed no formal answer, but testified and represented himself on the trial of the case.

Only two of the plaintiffs, Hunter Davis and Julius B. Cook, testified on the trial. From the evidence we find that these two plaintiffs presented themselves to the defendant board seeking to register as electors and that they presented satisfactory evidence of their qualifications to register as electors, but their applications were denied. The evidence shows they had the residential qualifications prescribed by Section 178 of the Constitution of Alabama, having continuously resided in the State of Alabama, in the County of Mobile, and in the precinct or ward where they lived

for more than two years immediately preceding the time when they applied for registration; that they were over the age of twenty-one years, and had been regularly engaged in lawful employment, business or occupation for the greater part of the twelve months next preceding the time at which they offered to register; that they are citizens of Alabama and of the United States, of good character, and possess all other qualifications of electors, unless it be said that they can be required to "understand and explain" any article of the United States Constitution to the reasonable satisfaction of the members of the defendant board. These two plaintiffs have none of the disqualifications set out in Section 182 of the Alabama Constitution.

We further find from the evidence that prior to the filing of this suit said Board of Registrars required Negro applicants for registration as electors in Mobile County to attempt to explain at least some article of the United States Constitution, while no such requirement was exacted of white applicants. We also find that the plaintiffs Davis and Cook were refused registration as electors because of their race or color.

Prior to this suit defendant board did not keep records of rejected applicants, whether white or Negro. The members of said board went into office in October, 1947. Registration records of said board, which were not disputed, were introduced showing that during their tenure, prior to March 1, 1948 (the filing date of this suit), 39 colored applicants were registered; that subsequent to March 1, 1948, 65 colored applicants were registered and 57 were rejected, the records of these 57 rejected applicants showing, in substance, that they were rejected because they could not "understand and explain" an article of the Federal Constitution. These records show that three white persons who were registered after this action was filed were asked to explain a provision of the Federal Constitution. The records of 11 rejected white applicants show that they were denied registration on grounds other than the requirements of the Boswell Amendment. The defendants offered nine colored witnesses, all of whom with one exception were public school teachers of good education, who testified that they were registered by the defendant board, some of them being asked if they could explain provisions of the Federal Constitution. The members of the defendant board generally required Negro applicants to explain or interpret provisions of the Federal Constitution, and did not generally require white applicants to do so.

The evidence shows that during the incumbency of the defendant board that more than 2800 white persons have been registered and approximately 104 Negroes. The estimated population of Mobile County is 230,000 of which approximately 64 per cent is white and 36 per cent is colored.

The States, not the Federal Government, prescribe the qualifications for the exercise of the franchise, and Federal Courts are not interested in these qualifications unless they contravene the Fifteenth Amendment or other provisions of the United States Constitution. The States have a right to prescribe a literacy test for electors. Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340, L.R.A.1916A, 1124. However, state action which denies due process or equal protection of the laws in the exercise of the right of suffrage is prohibited by the Fourteenth Amendment. Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458. The Fifteenth Amendment guarantees the free exercise of the right of franchise as against state discrimination based upon race or color. Guinn v. United States, supra; Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed 1281.

The subject matter of the Boswell Amendment is within state power, and its validity depends upon whether it squares with the Fourteenth and Fifteenth Amendments. We think it does not.

The original Section 181 of the Constitution of Alabama has stood for nearly 50 years and has provided definite standards for passing upon the qualifications of prospective electors. The original section provided for two qualifications, the possession of either of which was sufficient to permit registration. An applicant was required

to be able to "read and write any article of the constitution of the United States in the English language," or in the alternative, he could qualify if he owned, assessed and paid taxes on real or personal property of an assessed value of $300. The Boswell Amendment dropped the property qualification, and adopted a qualification requiring not only that an applicant be able to "read and write" but also that he be able to "understand and explain any article of the constitution of the United States in the English language."

Do the words "understand and explain" as used in the Boswell Amendment furnish a reasonable standard whereby boards of registrars may pass on qualifications of prospective electors, or are these words so ambiguous, uncertain, and indefinite in meaning that they confer upon said boards arbitrary power to register or to refuse to register whomever they please.

"Understand" is a word of many meanings and "a verb of very extensive signification."[4] Understanding may be based upon learning or knowledge or upon rumor or hearsay. It may mean to apprehend, or to comprehend, partially or fully. It may deal with meaning, import, intention or motive. It may mean to appreciate the force or value of a thing or proposition. It may mean that a person is informed or that he had merely received notice or heard of something. To understand may mean to imply, infer or assume, or it may contemplate knowing the meaning or the supposed meaning. It may mean to interpret.

"Explain" is also a word of indefinite meaning; it may mean to make plain, manifest or intelligible; to clear of obscurity; to expound, to illustrate by discourse or by notes.

The Boswell Amendment requires a prospective elector to "understand and explain any article of the constitution of the United States in the English language." There is no requirement that the understanding or explanation be in writing. The language does not call for a simple, fair or reasonable understanding or explanation. It does not say that the understanding and

explanation must be partial, full, complete, definite, proper, fair, reasonable, plain, precise, correct, accurate, or give any rule, guide or test as to the nature of the understanding or explanation that is required. The Amendment does not say to whose satisfaction the applicant must "understand and explain," but under the statutes,[5] it must be to the reasonable satisfaction of a majority of the members of one of the 67 boards of registrars that are provided for the 67 counties of Alabama.

The members of these boards are not required to be lawyers or learned in the law,[6] and it is fair to assume that many members of these boards do not have a good or correct understanding of the various articles of the Constitution, and that they might not be able to give any explanation of many of them. Many members of the boards of registrars might justly and properly say to an applicant for registration, "My legs do better understand me, sir, than I understand what you mean."

No uniform, objective or standardized test or examination is provided whereby an impartial board could determine whether the applicant has a reasonable understanding and can give a reasonable explanation of the articles of the Constitution (if, indeed, the test were to be a *reasonable* understanding and a *reasonable* explanation). If such a test or examination were provided to be administered to all prospective electors alike, then the boards of registrars would have definite guides to control their judgment in determining whether or not an applicant could "understand and explain" the provisions of the Constitution. Under such a test with proper questions or guides a record could be made which would give a rejected applicant a definite basis upon which he could seek and obtain a proper judicial review of the board's action, and the reviewing court would have something definite to act upon in ascertaining whether an applicant had been rightfully or arbitrarily and unjustly denied the right of suffrage.

As pointed out, "understand" may mean to interpret. This meaning requires an

---

[4] Dearing, Sink & Co. v. Smith & Wright, 4 Ala. 432, 438.

[5] See Note (3) above.

[6] Title 17, Section 21, Code of Alabama 1940.

exceedingly high, if not impossible, standard. The distinguished Justices of the Supreme Court of the United States have frequently disagreed in their interpretations of various articles of the Constitution. We learn from history that many of the makers of the Constitution did not understand its provisions; many of them understood and believed that its provisions gave the Supreme Court no power to declare an act of Congress unconstitutional. An understanding or explanation given by the Supreme Court a few years ago as to the meaning of the commerce clause does not apply today. Among our most learned judges there are at least four different understandings and explanations of the Fourteenth Amendment to the Constitution as to whether it made the first eight Amendments applicable to state action.[7] Such a rigorous standard—to interpret—is clearly within the legitimate range of the meanings of the phrase "understand and explain," and illustrates the completeness with which any individual or group of prospective electors, whether white or Negro, may be deprived of the right of franchise by boards of registrars inclined to apply this one of the innumerable meanings of such an indefinite phrase.

The words "understand and explain" do not provide a reasonable standard. A simple test may be given one applicant; a long, tedious, complex one to another; one applicant may be examined on one article of the Constitution; another may be called upon to "understand and explain" every article and provision of the entire instrument.

To state it plainly, the sole test is: Has the applicant by oral examination or otherwise understood and explained the Constitution to the satisfaction of the particular board? To state it more plainly, the board has a right to reject one applicant and accept another, depending solely upon whether it likes or dislikes the understanding and explanation offered. To state it even more plainly, the board, by the use of the words "understand and explain," is given the arbitrary power to accept or reject any prospective elector that may apply, or, to use the language of Yick Wo v. Hopkins, 118 U.S. 356, 366, 6 S.Ct. 1064, 1069, 30 L.Ed. 220, these words "actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent * * *." The board has the power to establish two classes, those to whom they consent and those to whom they do not—those who may vote and those who may not. Such arbitrary power amounts to a denial of equal protection of the law within the meaning of the Fourteenth Amendment to the Constitution, and is condemned by the Yick Wo and many other decisions of the Supreme Court.

When a word or phrase in a statute or constitution is ambiguous, it is the duty of the court, in construing the meaning of that word or phrase, to attempt to determine whether an exact meaning was intended and if so, to ascertain that meaning. If an exact meaning of the phrase "understand and explain" were to be discovered by a process of construction in this case, it might be that a suitable and definite standard could be found, which would not give to the board of registrars arbitrary power. However, a careful consideration of the legislative and other history of the adoption of this Amendment to the Constitution of Alabama discloses that the ambiguity inherent in the phrase "understand and explain" cannot be resolved, but, on the contrary, was purposeful and used with a view of meeting the decision of the Supreme Court of the United States in Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110. The history of the period immediately preceding the adoption of the Boswell Amendment, of which we take judicial notice, and the evidence in this case prove this.

The State Democratic Executvie Committee is an official arm of the State[8] and its action constitutes state action. Smith v. Allwright, supra. The activities

---

7 Cf. Adamson v. California, 1947, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223.

8 The State Democratic Executive Committee is the official governing body of the Democratic party in Alabama; its mem-

of this committee in sponsoring and leading the fight for the adoption of the Boswell Amendment are admissible and material in determining whether the Boswell Amendment is a contrivance by the State to thwart equality in the enjoyment of the right to vote by citizens of the United States on account of race or color.

The State Democratic Executive Committee spent its funds and led the fight to secure the adoption of the Boswell Amendment in its endeavor "to make the Democratic Party in Alabama the 'White Man's Party.'"[9] The chairman of this committee was instrumental in originating the Amendment and in making recommendations to the legislative committee as to changes he deemed advisable in Alabama's election laws to meet the "Texas case," under which Democratic primaries could no longer be limited to white voters. An overwhelming majority of the membership of this committee "took the position that we should be Militant Democrats and continue to fight for white supremacy in our State."[10]

The 72 members of this State Committee were urged to contact the members of the county Democratic executive committees, some 2500 in number, and all of the general election officials, some 14,000 in number, to secure their support in the campaign for the adoption of the Boswell Amendment, on the basis that the purpose of the Boswell Amendment was to restrict Negro registration.[11]

In the Alabama Lawyer, the official organ of the State Bar of Alabama, in the July 1946 issue, a distinguished Alabama lawyer, writing in opposition to the adoption of the Boswell Amendment, which was at that time awaiting action at the hands of the people of Alabama, said:

"Let us be frank and honest with ourselves. You and I know that the people of our State are expected to adopt this Amendment in order to give the Registrars arbitrary power to exclude Negroes from voting."

In the October 1946 issue of the same official publication, an equally distinguished Alabama lawyer, who favored the adoption

---

bers are elected by the voters in Democratic primaries. Cf. Title 17, Section 341, Alabama Code of 1940. Said committee is authorized to prescribe rules and regulations governing matters of party procedure. Title 17, Section 389. It has the authority to determine who shall be qualified as members and candidates for nomination, who shall be entitled to vote in primary elections, and to fix assessments to be paid by candidates for nomination at a primary election. Title 17, Section 347. Compensation of officers and expenses of all primary elections are paid out of the county or municipal treasury in the same manner and to the same extent as provided for the payment of expenses and officers of general elections held under the general election laws of Alabama. Title 17, Section 343. Section 190 of the Alabama Constitution provides that the legislature shall make provision by law for the regulation of primary elections, but provides that primary elections shall not be made compulsory.

9 In a letter dated August 27, 1946, addressed to the members of the State Democratic Executive Committee, the chairman of that committee, among other things, said:

"45 ballots were cast in favor of the State Committee expending up to $3,-500.00 in a compaign to have the 'Boswell Amendment' adopted, 7 ballots were cast against such expenditure, and 1 ballot was not voted. * * *

"I might add that while a few members of our State Committee have expressed the thought that the funds of the State Committee should not be expended in a campaign either for or against the adoption of the proposed 'Boswell Amendment,' yet the great majority of the members of our Committee have taken the position that since the emblem of our Party is a crowing rooster with the words 'White Supremacy' above the rooster, and the words 'For the Right' below the rooster, that it is entirely proper that the State Democratic Executive Committee should lead the fight to maintain the traditions of our Party in this State by adopting the proposed amendment to our Constitution and endeavoring, as far as it can legally be done, to make the Democratic Party in Alabama the 'White Man's Party.'"

(From Plaintiffs' Exhibit 5)

10 Plaintiffs' Exhibit 7.

11 Plaintiffs' Exhibit 6.

of the Boswell Amendment, declared with reference to that Amendment:

"* * * I earnestly favor a law that will make it impossible for a Negro to qualify, if that is possible. If it is impossible, then I favor a law, more especially a constitutional provision, that will come as near as possible, making possible, the impossible."

■ All of the foregoing but illustrates the intention and general understanding of the Legislature and electorate of Alabama at the time this Amendment was proposed and adopted by a small majority of a light vote. Such a history further demonstrates that this restrictive Amendment, coming on the heels of the decision of the Supreme Court of the United States in the Smith v. Allwright case, was intended as a grant of arbitrary power in an attempt to obviate the consequences of that decision.

Thus, the process of attempted construction of an ambiguous phrase by reference to legislative history and to the intent of the makers of the phrase in this instance only reinforces the conclusion that the provision in question was incorporated for the purpose of allowing arbitrary action, and not for the purpose of providing a definite and reasonable standard.

The defendants argue that the Boswell Amendment is not "racist in its origin, purpose or effect," but, as has already been illustrated, a careful consideration of the conditions existing at the time, and of the circumstances and history surrounding the origin and adoption of the Boswell Amendment, and its subsequent application, demonstrate that its main object was to restrict voting on a basis of race or color. That its purpose was such is further illustrated by the campaign material that was used to secure its adoption.

The Alabama Democrat,[12] a campaign document in the form of a newspaper published in support of the adoption of the Boswell Amendment consisted in its entirety of arguments urging the voters to adopt the Amendment for the purpose of restricting voting by Negroes. This document carried the headline: "WARNING IS SOUNDED: BLACKS WILL TAKE OVER IF AMENDMENT LOSES" and the footline: "VOTE WHITE—VOTE RIGHT—VOTE FOR AMENDMENT NO. 4."

Similarly, an editorial of the Talladega Home, reproduced in said document, asked the question: "What is the Boswell Amendment?" and answered the question by saying, "It is a measure designed simply and solely to enable registrars legally to hold down the number of Negro registrants."

■ Furthermore, the administration of the Boswell Amendment by the defendant board demonstrates that the ambiguous standard prescribed has, in fact, been arbitrarily used for the purpose of excluding Negro applicants for the franchise, while white applicants with comparable qualifications were being accepted. The evidence is without dispute that this Amendment has been used to disqualify many Negro applicants for registration while it does not definitely disclose that it has been used to disqualify a single white applicant. It is further shown that as a rule the Boswell test of "understand and explain" is required of Negroes while no such exaction is made of white applicants.

■ ■ It, thus, clearly appears that this Amendment was intended to be, and is being used for the purpose of discriminating against applicants for the franchise on the basis of race or color. Therefore, we are necessarily brought to the conclusion that this Amendment to the Constitution of Alabama, both in its object and the manner of its administration, is unconstitutional, because it violates the Fifteenth Amendment. While it is true that there is no mention of race or color in the Boswell Amendment, this does not save it. The Fifteenth Amendment "nullifies sophisticated as well as simple-minded modes of discrimination," and "It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race." Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281. Cf. Smith v. Allwright, supra; Guinn v. United States, supra.

---

[12] Plaintiffs' Exhibit 8.

We cannot ignore the impact of the Boswell Amendment upon Negro citizens because it avoids mention of race or color; "To do this would be to shut our eyes to what all others than we can see and understand."[13]

 The Amendment being unconstitutional, the plaintiffs are entitled to injunctive relief.

McCORD, Circuit Judge, and McDUFFIE, District Judge, concurring.

Brown, Douglas and Brown, of St. Joseph, Mo., for plaintiffs.

Sam A. Wear, U.S. Atty., and Thomas A. Costolow, Asst. U.S. Atty., both of Kansas City, Mo., for defendant.

---

[13] United States v. Butler, 297 U.S. 1, 61, 56 S.Ct. 312, 317, 80 L.Ed. 477, 102 A.L.R. 914.

81 F.SUPP.—56