**ORLEANS PARISH SCHOOL BOARD,**
Appellant,

v.

**Earl Benjamin BUSH et al., Appellees.**

**No. 16190.**

United States Court of Appeals
Fifth Circuit.

March 1, 1957.

Rehearing Denied April 5, 1957.

Gerard A. Rault, New Orleans, La., W. Scott Wilkinson, Shreveport, La., for appellant.

Robert L. Carter, New York City, U. Simpson Tate, Dallas, Tex., A. P. Tureaud, A. M. Trudeau, Jr., New Orleans, La., Thurgood Marshall, New York City, for appellees.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal in an action on behalf of certain New Orleans Negro school children from a judgment of the District Court for the Eastern District of Louisiana enjoining appellant "from requiring and permitting segregation of the races in any school under their supervision, from and after such time as may be necessary to make arrangements for admission of children to such schools on a racially non-discriminatory basis with all deliberate speed as required by the decision of the Supreme Court in Brown v. Board of Education of Topeka, 349 U. S. 294 [75 S.Ct. 753, 99 L.Ed. 1083]."

The principal grounds of appellant's attack on the validity of this order are: (1) This was a suit against the State of Louisiana and is prohibited by the XIth Amendment to the Constitution; (2) The complaint failed to state a claim on which relief could be granted; (3) The court erred in holding that the provisions of Art. XII, Sec. 1 of the Louisiana Constitution–LSA requiring separate schools

for white and colored children and that all of Louisiana Act 555 and Section 1 of 556 of 1954 LSA–R.S. 17:81.1, 17:331–17:334, requiring segregation and assignment of pupils respectively in public schools were invalid; (4) The proof on behalf of plaintiffs and countershowing by defendant did not warrant the issuance of a temporary injunction. These points as well as subsidiary questions will be discussed after a brief statement of the factual background.

On November 12, 1951, appellees petitioned the School Board "to end at once the practice and custom of discriminating against Negro students solely on account of their race and color and admit these Negro children and all others similarly situated to the public schools of Orleans Parish which have heretofore and are now restricted to the enrollment of white children." This petition was denied by official action of the Board on November 26, 1951.[1] On February 19, 1952, an appeal was taken to the State Board of Education; no reply having been received, appellees again, on August 14th, requested action on their petition; on August 27th a reply was received over the signature of the Secretary of the State Board, which while not categorically denying the petition stated: "The Board feels that many of the items included are wholly within the jurisdiction of the Board."[2] On September 5, 1952, the original complaint in this action was filed. It alleged great disparities between the physical plant and the content of the curricula of Negro and white schools, and also alleged discrimination because of segregation per se. It alleged that the Board was pursuing a policy and custom of maintaining separate schools for white and Negro children under the provisions of Art.

XII, Sec. 1 of the Louisiana Constitution. It sought a declaratory judgment on the questions, among others, (a) "whether the policy, custom, practice and usage of defendants * * * in denying on account of race or color to infant plaintiffs and others similarly situated * * * educational opportunities, advantages and facilities * * * equal to the educational opportunities, advantages and facilities afforded and available to white children * * * is unconstitutional and void as being a denial of the equal protection of the laws guaranteed under the Fourteenth Amendment to the Constitution of the United States;" (b) "whether Article XII Sec. 1 of the Constitution of 1921 of the State of Louisiana which prohibits infant plaintiffs from attending the only public schools of Orleans Parish where educational opportunities, advantages and facilities equal to those afforded all other qualified pupils * * * are available and force them to attend secondary schools in Orleans Parish solely because of race and color is unconstitutional and void as a violation of the Fourteenth Amendment of the Constitution of the United States." It also prayed a judgment declaring that the separate schools provision of Article XII, Sec. 1 of the Louisiana Constitution is a denial of the equal protection clause of the Fourteenth Amendment and is therefore unconstitutional and void, and for a permanent injunction enjoining defendant Board from following such provision as being in contravention of rights guaranteed under the United States Constitution.

By stipulation proceedings on this complaint were suspended on account of the pendency of the school Segregation cases[3] in the Supreme Court of the United States.

---

1. This action was taken several years before the adoption of the pupil assignment law with its provisions for administrative relief, which will be discussed later.

2. The petition had pointed out many alleged inequalities between the facilities in the white and Negro schools. In any event this is either a rejection of the request or a statement that the Parish Board had final jurisdiction.

3. Brown v. Board of Education of Topeka, Kan., 347 U.S. 483, 74 S.Ct. 686, 98 L. Ed. 873, and related cases.

After the first opinion in the Brown case the State Legislature of Louisiana proposed and the people adopted an amendment to Art. XII, Sec. 1 of the State Constitution which had already provided, in effect, that all public elementary and secondary schools should be operated separately for white and colored children by adding that "This provision is made in the exercise of the state police power to promote and protect public health, morals, better education and the peace and good order in the State, and not because of race. The Legislature shall enact laws to enforce the state police power in this regard." The Legislature then promptly enacted Acts 1954, No. 555 and 556. Section 1 of 555 merely repeated the constitutional requirement of separate schools. Section 2, 3 and 4 provide for penalties to be imposed on local boards and an individual failing to observe the requirements as to separate schools in Section 1. Section 5 is a separability clause.[4] Act 556, adopted at the same time, is the pupil assignment statute. It provides for assignment of each pupil each year by the parish superintendent to a particular school, and, without providing any standards other than those of Act 555 for separation of the races, provides for an appeal to the local board and then to the State Board and thereafter to the state district court.[5]

4. Act 555 in full appears as follows in L.S.A. 17:

"§ 331. Separate operation required

"All public elementary and secondary schools in the state of Louisiana shall be operated separately for white and colored children. This provision is made in the exercise of the State police power to promote and protect public health, morals, better education and the peace and good order in the state and not because of race. Acts 1954, No. 555, § 1."

"§ 332. Non-recognition of schools violating Sub-part

"The State Board of Education shall not approve any public schools which may violate the provisions of this Sub-part nor shall any of the state colleges or university recognize any certificate of graduation from such public school which may violate the provisions of this Sub-part as entitling the holder thereof to admission. Acts 1954, No. 555, § 2."

"§ 333. Schools violating Sub-part to be deprived of supplies and funds

"No free school books or other school supplies shall be furnished, nor shall any state funds for the operation of school lunch programs, or any other school funds be furnished or given to any public elementary or secondary school which may violate the provisions of this Sub-part as above. Acts 1954, No. 555, § 3."

"§ 334. Penalty for violations

"Any person, firm or corporation violating any of the provisions of this Sub-part shall be deemed guilty of a misdemeanor and upon conviction therefor by a court of competent jurisdiction for each such violation shall be fined not less than five hundred dollars nor more than one thousand dollars, or sentenced to imprisonment in the parish jail not less than ninety days nor more than six months, or both, fined and imprisoned as above, at the discretion of the court. Acts 1954, No. 555, § 4."

"§ 335.

"In case any part of this Act shall be held to be unconstitutional, this shall not have the effect of invalidating any part of it that is constitutional, and the part or parts not affected by such ruling shall continue in full force and effect. This Act shall be liberally construed to protect and preserve the State Police Power as provided in this Act." Acts of 1954, No. 555, § 5.

5. Act 556, Sec. 1, in full, appears as follows in L.S.A. 17:

"§ 81.1. Assignment of children to particular schools by parish superintendent; hearings; review by board; appeal

"Each parish superintendent of schools, throughout this state, shall, each year, determine the particular public school within each parish to be attended by each school child applying for admission to public schools. No school child shall be entitled to be enrolled or to enter into a public school until he has been assigned thereto in accordance with the provisions of this Section. In the event of dissatisfaction with the school assignment made by the superintendent, the parents or next of kin to the child affected, within ten days from the date of assignment may apply to the school superintendent for a hearing to have said child assigned to some other public school in the parish, in which case the superintendent shall grant a hearing, and within thirty days after the conclusion of said hearing, the superintendent shall hand down a decision in writing either sustaining his school assignment in ques-

Following the enactment of these laws, appellees petitioned the school board to take immediate steps to reorganize the schools under its jurisdiction on a non-discriminatory basis. No reply was made to this or to a subsequent petition, but the board engaged counsel to "defend, as special attorney for the Board, both in the trial court and in the Courts of Appeal" the action then pending.[6] Soon thereafter appellees filed a first amended complaint setting up the provisions of the amended constitution and the newly enacted statutes, a prayer for declaratory relief holding them invalid and renewing their prayer for preliminary and permanent injunction against the enforcement by the board of the provisions of the new laws.

The defendant board filed its motion to dismiss and the state of Louisiana prayed the right to intervene solely for the purpose of filing a motion to dismiss the suit as being one against the State.

No order appears to have been entered allowing this intervention and the State is not appearing as a party on this appeal, although a brief has been tendered on behalf of the State as amicus curiae. Its petition for leave to file is hereby granted and its brief has been considered by the Court.

### Nature of the Suit

■ We consider first whether there is any merit in appellant's contention that this is in fact a suit brought by citizens of the State of Louisiana against the State. Of course such a suit is prohibited by the principle of sovereign immunity and by analogy to the Eleventh Amendment to the Constitution of the United States. Hans v. State of Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842.

It would seem hardly worth our considering this contention in light of the fact that all of the School Segregation

---

tion or changing the same. The action of the parish superintendent shall be reviewable by the parish school board upon application of any person paying ad valorem taxes for the support and maintenance of the public schools or on the application of any other party in interest. Any such application for review shall be filed with the parish school board within thirty days from the day the action complained of was taken and within sixty days thereafter, said parish school board shall hold a hearing at which evidence shall be taken down and transcribed, the cost thereof to be paid for by the party making said application prior to submission of the matter to the school board. The school board shall have the right to require applicant to furnish bond for costs within a reasonable sum, properly secured, prior to the holding of said hearing. The parish school board shall consider the evidence so adduced and as soon as practicable render its decision in writing. Any person, having applied for and secured a hearing by the parish school board who feels aggrieved by the ruling of said board shall have the right to apply to the district court of the domicile of the said board and the right to appeal from the judgment of the district court to the appropriate court of appeal, provided, however, that such right to apply to the district court shall not exist until said party shall have complied with the

provisions hereof, and shall have exhausted the administrative remedies provided for herein.

"Each school board throughout the state shall have authority to adopt rules and regulations governing the hearing and appeals provided for herein.

"Wherever reference is made to parish superintendent of schools or school boards the same shall apply to those in the cities of Monroe, Bogalusa and Lake Charles. Added Acts 1954, No. 556, § 1."

6. The resolution stated it to be the policy of the board to maintain its policy of segregation by the language in the following "Whereas" clauses:

"Whereas a class action has been instituted in the United States District Court for the Eastern District of Louisiana by Earl Benjamin Bush and others against the Orleans Parish School Board and its superintendent demanding a preliminary and ultimately a permanent injunction agaist the segregation of the races in the public schools of New Orleans;

"Whereas it is not only to the manifest interest of this Board and in accord with its expressed policy, but also in furtherance of the public welfare of this community that this suit and any others that might be instituted with the same objective be vigorously, aggressively, and capably defended;"

Cases were actions of the same type as the one before us (suits against a state official or board operating under State authority) were it not for the fact that both the appellant and the Attorney General of the State urge it so strongly upon us. The burden of their argument is that this is a suit to compel state action, which under a long line of cases, including Great Northern Life Insurance Company v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121, and Ford Motor Company v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389, falls within the prohibition whether nominally against the State or against state officials. But this suit does not seek to compel state action. It seeks to prevent action by state officials which they are taking because of the requirements of a state constitution and laws challenged by the plaintiffs as being in violation of their rights under the Federal Constitution. If in fact the laws under which the board here purports to act are invalid, then the board is acting without authority from the State and the State is in nowise involved. That a federal court can entertain a suit where such a situation is alleged has long been recognized. In Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 453, 52 L.Ed. 714, the Supreme Court said in such a case as this:

"* * * It is contended that the complainants do not complain and they care nothing about any action which Mr. Young might take or bring as an ordinary individual, but that he was complained of as an officer, to whose discretion is confided the use of the name of the state of Minnesota so far as litigation is concerned, and that when or how he shall use it is a matter resting in his discretion and cannot be controlled by any court.

"The answer to all this is the same as made in every case where an official claims to be acting under the authority of the state. The act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the state to enforce a legislative enactment which is void because unconstitutional. If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States."

Georgia Railroad & Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335, relied on by the trial court, is the most recent pronouncement of the Supreme Court to the same effect. See also School Board of City of Charlottesville, Va. v. Allen, 4 Cir., 1956, 240 F.2d 59, where the Court of Appeals for the Fourth Circuit held a suit such as this not to be one against the State of Virginia.

There is no merit in the claim of appellant that the court was without jurisdiction to try this case as being a suit against the state. The substance of this suit is that the school board is unconstitutionally forcing them to attend schools that are segregated according to race and their prayer is that the board be enjoined from continuing to do so. If plaintiffs are right in their contention, then they can obtain complete relief from this defendant, because any sanctions compelling it to continue its illegal conduct fall when the Court determines that such sanctions are illegal.

## Exhaustion of Administrative Remedies

■ The second ground of appellant's motion to dismiss was its contention that the complaint fails to state a claim on which relief can be granted. The first basis for this attack is that, assuming all the allegations as to unconstitutional acts by the defendant to be true, the plaintiffs have not pursued their administrative remedies for relief before filing of their suit. In asserting this contention appellant seems to overlook completely the fact that when this suit was filed there was no pupil assignment law on the statute books. So far as has been called to our attention the plaintiffs did all they were required to do administratively in 1951 to seek relief from the condition of which they were complaining, i. e. inequality and discrimination between the facilities of white and colored schools and the discrimination resulting per se from the operation of a segregated school system. They applied to the defendant for relief and appealed its adverse decision to the state board which remanded them to the local board. Where else they could go administratively is nowhere suggested by appellant, which argues the entire matter as though there had been a pupil assignment statute on the books.

■ But assuming that the trial court and we should view this question in the light of conditions after the passage of the 1954 acts, which, however, we do not decide, there is still no merit in appellant's argument. Appellees were not seeking specific assignment to particular schools. They, as Negro students, were seeking an end to a local school board rule that required segregation of all Negro students from all white students. As patrons of the Orleans Parish school system they are undoubtedly entitled to have the district court pass on their right to seek relief. Jackson v. Rawdon, 5 Cir., 235 F.2d 93, cert. denied 352 U.S. 925, 77 S.Ct. 221, 1 L.Ed.2d 160, and see School Board of City of Charlottesville, Va. v. Allen, supra.

Moreover, so long as assignments could be made under the Louisiana constitution and statutes only on a basis of separate schools for white and colored children to remit each of these minor plaintiffs and thousands of others similarly situated to thousands of administrative hearings before the board for relief that they contend the Supreme Court has held them entitled to, would, as the trial judge said, "be a vain and useless gesture, unworthy of a court of equity, * * * a travesty in which this court will not participate." See Adkins v. School Board of City of Newport News, D.C.E.D.Va., 148 F.Supp. 430.

## Proof of Actual or Immediate Irreparable Injury

■ A further basis for appellant's claim that the suit should be dismissed was that there was no showing of actual or immediate irreparable injury. It may well be argued to the contrary that, assuming that plaintiffs are being denied their constitutional right to equality with members of the white race in their educational opportunities, every day that passes counts as an irremediable loss to the school child thus discriminated against. The simplest answer to this contention, however, is in the limited action of the court, which was well within what was prayed for by appellees. It declared the rights of the parties as they prayed and restrained the board from "requiring and permitting segregation of the races in any school under their supervision, from and after such time as may be necessary to make arrangements for admission of children to such schools on a racially nondiscriminatory basis with all deliberate speed as required by the decision of the Supreme Court in Brown v. Board of Education of Topeka, supra."

Such an order, while in the form of a preliminary injunction, contained no immediately compulsive features so far as relieving the plaintiffs of day by day injury was concerned. Inasmuch as they do not complain of the failure of the court to afford them immediate relief it

seems to us that there is little ground for the board to do so on this particular ground.

### Constitutionality of Louisiana Constitution and Laws

We have heretofore dealt with contentions advanced by appellant which it says entitle it to a dismissal of the action whether or not the plaintiffs are being denied their constitutional rights. We now come to the question whether under the statutes of Louisiana enacted pursuant to the amendment to that State's constitution the legal position of the parties here differs from that which the litigants occupied in the School Segregation case, supra. Obviously if nothing new or different has been added the plaintiffs are entitled to a declaratory judgment declaring their right "to have the school board, acting promptly, and completely uninfluenced by private and public opinion as to the desirability of desegregation in the community, proceed with deliberate speed consistent with administration" to abolish segregation in the Orleans parish school system. Jackson v. Rawdon, supra, 235 F.2d at 96.

The new circumstance to which appellant points is the amendment to the Louisiana constitution which, in effect, provides that there shall continue to be racially separate schools, which separation is stated for the first time to be "in the exercise of the state police power to promote and protect public health, morals, better education and the peace and good order in the State, and not because of race." There is also the new pupil assignment law which we have already discussed.

Appellant nowhere in its brief undertakes to explain the process of reasoning by which it seeks to have this Court conclude that racial segregation in the schools is any less segregation "because of race" merely because the stated basis of adhering to the policy is in the exercise of the State's police power. Nor does the brief filed by the Attorney General of Louisiana discuss the issue.

However, the affidavits introduced on the hearing for preliminary injunction make clear what the briefs do not. They deal with the alleged disparity between the two races as to intelligence ratings, school progress, incidence of certain diseases, and percentage of illegitimate births, in all of which statistical studies one race shows up to poor advantage. This represents an effort to justify a classification of students by race on the grounds that one race possesses a higher percentage of undesirable traits, attributes or conditions. Strangely enough there seems never to have been any effort to classify the students of the Orleans Parish according to the degree to which they possess these traits. That is, there seems to have been no attempt to deny schooling to, or to segregate from other children, those of illegitimate birth or having social diseases or having below average intelligence quotients or learning ability because of those particular facts. Whereas any reasonable classification of students according to their proficiency or health traits might well be considered legitimate within the normal constitutional requirements of equal protection of the laws it is unthinkable that an arbitrary classification by race because of a more frequent identification of one race than another with certain undesirable qualities would be such reasonable classification.

The use of the term police power works no magic in itself. Undeniably the States retain an extremely broad police power. This power, however, as everyone knows, is itself limited by the protective shield of the Federal Constitution. Thus, for instance, municipal zoning laws passed to require racially segregated residential zoning have been struck down under the Fourteenth Amendment. In Buchanan v. Warley, 245 U.S. 60, at page 74, 38 S.Ct. 16, at page 18, 62 L.Ed. 149, the Supreme Court said:

"The authority of the state to pass laws in the exercise of the police power, having for their object the promotion of the public health, safe-

ty and welfare is very broad as has been affirmed in numerous and recent decisions of this court. Furthermore the exercise of this power, embracing nearly all legislation of a local character is not to be interfered with by the courts where it is within the scope of legislative authority and the means adopted reasonably tend to accomplish a lawful purpose. But it is equally well established that the police power, broad as it is, cannot justify the passage of a law or ordinance which runs counter to the limitations of the federal Constitution; that principle has been so frequently affirmed in this court that we need not stop to cite the cases."

To the same effect see the Georgia case of Carey v. City of Atlanta, 143 Ga. 192, 84 S.E. 456, L.R.A.1915D, 684.

▌ Probably the most clear cut answer to this effort by the State of Louisiana to continue the pattern of segregated schools in spite of the clear and unequivocal pronouncement of the Supreme Court in the School Segregation cases [7] is that this is precisely what was expressly forbidden by those decisions. Whatever may have been thought heretofore as to the reasonableness of classifying public school pupils by race for the purpose of requiring attendance at separate schools, it is now perfectly clear that such classification is no longer permissible, whether such classification is sought to be made from sentiment, tradition, caprice, or in exercise of the State's police power.

From what we have said the conclusion is obvious that the state constitutional provisions as to maintaining separate schools for white and colored children is in direct conflict with the equal protection clause of the Fourteenth Amendment and is void and of no effect. The same is true of the statute designed to implement this constitutional requirement, Act 555, of 1954.

▌ We next come to the Pupil Assignment Law. Although we have already expressed the view that this statute did not have the effect of preventing the commencement and maintenance of this action, the role it might have in the future disposition of the case by the trial court makes it appropriate for us to answer appellant's contention that that court erred in holding it invalid.

Whatever might be the holding as to the validity of an administrative pupil assignment statute containing reasonably certain or ascertainable standards to guide the official conduct of the superintendent of the local school board and to afford the basis for an effective appeal from arbitrary action, Act 556 is not such a statute. The plaintiffs, seeking to assert their right to attend nonsegregated schools as guaranteed them under the Constitution, would be remitted to an administrative official guided by no defined standards in the exercise of his discretion.[8] In such circumstances

7. "We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment." Brown v. Board of Education, 347 U.S. 483, at page 495, 74 S.Ct. at page 692.

"These cases were decided on May 17, 1954. The opinion of that date, declaring the fundamental principle that racial discrimination in public education is unconstitutional, are incorporated herein by reference. All provisions of federal, state, or local law requiring or permitting such discrimination must yield to this principle. There remains for consideration the manner in which relief is to be accorded." Brown v. Board of Education, 349 U.S. 294, at page 298, 75 S.Ct. at page 755.

8. Cf. Carsen v. Warlick, 4 Cir., 238 F.2d 724; the North Carolina Pupil Enrollment Act there involved was held by the court to contain adequate standards.

no number of hearings or appeals would avail them anything because it would be impossible for them to bring forward any proof bearing on whether they possessed those attributes, qualifications, or characteristics that would bring them within the group of students permitted to attend the particular school or schools. Attempts by statute to give any official the power to assign students to schools arbitrarily according to whim or caprice are legally impermissible, especially if considered in light of the history of assignments made in a manner that has now been held to be unconstitutional and of the recently readopted requirement of the state constitution reaffirming such unconstitutional standards, which is reinforced by the heavy sanctions against any official permitting a departure therefrom contained in a companion statute. Such a statute is unconstitutional either because it has on its face the effect of depriving appellees of their liberty or property without due process of law or as having implied as its only basis for assignments the prohibited standard of race. See Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, and Davis v. Schnell, D.C.S.D.Ala. (3 judge court), 81 F.Supp. 872, affirmed, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093. Thus we need not determine whether the enactment of this law contemporaneously with Act 555 and closely following the readoption of the racially separate schools provision of the state constitution, under circumstances that make it plain to all that the Assignment Act too was a further effort to stave off the effect of the Supreme Court's school decisions, is sufficient of itself to condemn it as part of the illegal legislative plan comprehended in Act 555, although this is precisely the type of determination on which the three judge court in Davis v. Schnell, supra, based its decision striking down an amendment to the Alabama constitution.[9] Nor is it necessary for us to pass on the possible validity of a statute that would merely grant to school officials the power to promulgate rules of attendance, zoning of school population, transfers and the like, so long as all such rules are applied in a manner as to affect all pupils without regard to their race, and are not used as a mere screen to perpetuate compulsorily segregated schools contrary to the court's order.[10]

■ There remains the complaint of the appellant that this is not truly a class action. What we have heretofore said with respect to the nature of the relief sought makes it clear that there is no merit in this contention. Here is a well-defined class whose rights are sought to be vindicated. We think that our decisions in Adams v. Lucy, 5 Cir., 228 F. 2d 619, certiorari denied 351 U.S. 931, 76 S.Ct. 790, 100 L.Ed. 1460, and Board of Supervisors of L. S. U., etc. v. Tureaud, 5 Cir., 225 F.2d 434, affirmed en banc, 5 Cir., 228 F.2d 895, certiorari denied 351 U.S. 924, 76 S.Ct. 780, 100 L. Ed. 1454, by clearest implication reject appellant's contention that in such a situation the named plaintiffs may not bring a class action on behalf of themselves and all others similarly situated. See also Carter v. School Board of Arlington County, Va., 4 Cir., 182 F.2d 531, and Frasier v. Board of Trustees of University of North Carolina, D.C., 134 F.Supp. 589, affirmed per curiam 350 U.S. 979, 76 S.Ct. 467, 100 L.Ed. 848.

Moreover, it is worthy of note that the series of cases generally known as the School Segregation cases [11] themselves were all class actions in the same sense as is the one before us.

In sum, therefore, we find no basis for the appellant's attack on the order

9. See also Adkins v. School Board of City of Newport News, D.C.E.D.Va., 148 F. Supp. 430, 433.

10. See School Board of City of Charlottesville, Va. v. Allen, supra, and Carsen v. Warlick, supra.

11. Brown v. Board of Education of Topeka, Kansas, supra.

**166**

entered by the trial court. The able and experienced trial judge gave full recognition to the administrative difficulties attendant upon changing the schools of the Parish of Orleans, including as it does, the schools of the City of New Orleans, from the established pattern of segregation on account of race. Although requiring immediate acceptance of the principle of non-segregated schools he allowed the Board time to put it into effect. Clearly implying that arrangements should be started at once, he nevertheless fixed the date after which there were to be no further distinction based on race at "such time as may be necessary to make arrangements for admission of children to such schools on a racially non-discriminatory basis with all deliberate speed as required by the decision of the Supreme Court in Brown v. Board of Education."

 It is evident from the tone and content of the trial court's order and the willing acquiescence in the delay by the aggrieved pupils that a good faith acceptance by the school board of the underlying principle of equality of education for all children with no classification by race might well warrant the allowance by the trial court of time for such reasonable steps in the process of desegregation as appears to be helpful in avoiding unseemly confusion and turmoil. Nevertheless whether there is such acceptance by the Board or not, the duty of the court is plain. The vindication of rights guaranteed by the Constitution can not be conditioned upon the absence of practical difficulties. However undesirable it may be for courts to invoke federal power to stay action under state authority, it was precisely to require such interposition that the Fourteenth Amendment was adopted by the people of the United States. Its adoption implies that there are matters of fundamental justice that the citizens of the United States consider so essentially an ingredient of human rights as to require a restraint on action on behalf of any state that appears to ignore them.

The orders of the trial court are

Affirmed.