Ralph STELL, a minor by L. S. Stell, Jr., his father and next friend, et al., Plaintiffs,

v.

SAVANNAH–CHATHAM COUNTY BOARD OF EDUCATION, et al., Defendants,

and

Lawrence Roberts and Daniel Roberts, minors by Adrienne Roberts, their mother and next friend, et al., Intervenors.

Civ. A. No. 1316.

United States District Court
S. D. Georgia,
Savannah Division.

June 28, 1963.

B. Clarence Mayfield, E. H. Gadsden, Savannah, Ga., Donald L. Hollowell, Atlanta, Ga., Jack Greenberg, Constance Baker Motley, Derrick A. Bell, Jr., New York City, for plaintiffs.

Basil Morris, Savannah, Ga., E. Freeman Leverett, Deputy Asst. Atty. Gen., Atlanta, Ga., for defendants.

R. Carter Pittman, Dalton, Ga., Charles J. Bloch, Macon, Ga., J. Walter Cowart, Savannah, Ga., George S. Leonard, Washington, D. C., for intervenors.

SCARLETT, District Judge.

### The Issues

This is a class action in the right of the minor Negro plaintiffs as students in public schools of Savannah-Chatham County to enjoin defendant Board of Education from operating a bi-racial school system. Alternately plaintiffs pray a mandatory injunction to compel defendants to submit a plan for the admission of Negro applicants to the white schools now maintained in Savannah-Chatham County.

It was alleged in the complaint that admission to the various public schools of Savannah-Chatham County is determined solely upon the basis of race and color and that plaintiffs are irreparably injured thereby.

The defendants formally denied these allegations but conceded the existence of a dual school system for white and Negro students in the City and County. De-

fendants further pleaded certain administrative difficulties which would ensue if the relief demanded in the complaint were to be granted.

A motion to intervene on behalf of themselves and their class was made by minor white school children alleging that the separation of Negro and white children in the public schools was not determined solely by race or color but rather upon racial traits of educational significance as to which racial identity was only a convenient index.

Among these significant factors for consideration in devising a rational program best suited to the peculiar educational needs of Negro and white school children in separate schools were:

(a) differences in specific capabilities, learning progress rates, mental maturity, and capacity for education in general;

(b) differences in physical, psychical and behavioral traits.

The differences were alleged to be of such magnitude as to make it impossible for Negro and white children of the same chronological age to be effectively educated in the same classrooms.

It was alleged that to congregate children of such diverse traits in schools in the proportion and under the conditions existing in Savannah would seriously impair the educational opportunities of both white and Negro and cause them grave psychological harm.

Plaintiffs objected to the motion for intervention, stating that the decision of the Supreme Court in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, created a conclusive presumption of injury to Negro students by reason of segregation such as to withdraw from white children or school authorities any right to show either an absence of injury from segregation in the area concerned or that compulsory integration of Negro and white school children rather than segregation would cause great and irreparable injury to both.

Sitting without a jury, the court allowed the intervention and proceeded to trial, reserving any ruling on plaintiffs' objection until the conclusion of the evidence.

## The Trial

At the opening of the trial plaintiffs showed the maintenance of separate white and Negro primary and secondary schools by the defendants and a corresponding assignment of teachers and staff. Plaintiffs offered no evidence in support of their allegation of injury to themselves from the maintenance of the dual school system. When plaintiffs rested, defendants came forward to show that reasonable inquiry was being made and hearings were being held by defendant Board on petitions for integration when the complaint herein was filed. Defendants further proved that no Negro plaintiff or other student had, prior to this action or since, applied for a transfer to any white school. Defendants then rested.

Intervenors first called Dr. R. T. Osborne, Professor of Psychology and Director of the Student Guidance Center at the University of Georgia, conceded by plaintiffs to be an authority in the field of educational psychology. Dr. Osborne stated that, on an annual basis since 1954, the County and City had, under a testing program devised by him, administered the California Achievement Battery and the California Mental Maturity Test to all students in the sixth, eighth, tenth and twelfth grades. The Battery was described as a set of nationally accepted standard achievement tests in reading comprehension and vocabulary, mathematical reasoning and fundamentals and the application of mathematical concepts. The Mental Maturity Test was described as being a nationally accepted standard indicator of the ratio between mental and chronological age, sometimes referred to as intelligence quotient or I.Q.

Dr. Osborne assisted in training the teachers to administer these tests on a uniform basis. He stated the tests were intended to evaluate achievement levels and provide specific information to counsellors, teachers and school administrators in the City and County school system. Superintendent of Schools McCormac had theretofore testified that this test program had been initiated by the City and County to adapt or accommodate

the instructional program to the educational needs and abilities of individuals and student groups and to aid in counseling.

Course selection was effected by the designation of different elective subjects to be made available in each of the schools, based on student request and in consultation with school counsellors and teachers.

For test evaluation, Dr. Osborne made a comparative study of the training and experience of the teachers in the white and Negro schools which showed Negro teachers with more collegiate and graduate training and teaching experience, higher pay and closer supervision in their schools. The Court notes that plaintiffs have at no time made any suggestion that the schools attended by Negroes in Savannah-Chatham County are inadequate or that any differences in achievement resulted from a deprivation of educational opportunity.

The test results were analyzed by Dr. Osborne's staff at the University of Georgia and summarized in a 1962 monograph published by him.[1] These results show that major differences exist in the learning ability patterns of white and Negro pupils. In reading, Negro students are two school years behind the white children at the sixth grade level. This increases to a reading difference between the two of more than three school years in the twelfth grade.

CALIFORNIA READING TEST

WHITE MALE (N=241)
WHITE FEMALE (N=298)
NEGRO MALE (N=109)
NEGRO FEMALE (N=164)

ACTUAL SCHOOL GRADE PLACEMENT

FIG. 1

*Average grade placements earned on California Reading Test by White and Negro pupils tested in grades 6, 8, 10, and 12.*

1. Osborne, Robert T.; 1962; "Racial Difference in School Achievement." Mankind Monographs, No. III.

The test results on arithmetic show a comparable difference in the sixth grade but show an even greater variation than in reading at the twelfth grade level. The average Negro pupil in the twelfth grade of the Savannah-Chatham County schools is below the eighth grade national arithmetic norm. White children who have been given the same courses tested above the eleventh grade national norm.

CALIFORNIA ARITHMETIC TEST

WHITE MALE (N=241)
WHITE FEMALE (N=298)
NEGRO MALE (N=109)
NEGRO FEMALE (N=164)

6 (1954)  8 (1956)  10 (1958)  12 (1960)

FIG. 2

*Average grade placements earned on California Arithmetic Test by White and Negro pupils tested in grades 6, 8, 10, and 12.*

Growth patterns can be considered separately from specific subject achievement. Learning rates are measured in terms of mental ability intelligence quotients. Learning rates were determined in Savannah-Chatham County by the California Mental Maturity Test. In sixth grade the mental age of Negro students was two years behind their chronological age on the average. By the tenth grade this separation increased to a three year equivalent and remained at this point thereafter. Of the 10% of Negro students who scored at or above the white median in the sixth grade, only 1% exceeded this median in the tenth grade where the white median I.Q. was 103, the Negro, 81. The chart of this test follows the general pattern of the achievement results.

1. Blacks being given culturally biased tests

2. Blacks, by dint of segregation, have less motivation to learn. If integrated, they will catch up

## CALIFORNIA TEST OF MENTAL MATURITY

——— WHITE MALE (N=241)
– – – – – WHITE FEMALE (N=298)
–·–·– NEGRO MALE (N=109)
–··–··– NEGRO FEMALE (N=164)

ACTUAL SCHOOL GRADE PLACEMENT

FIG. 3

*Average intelligence grade placements earned on California Mental Maturity Test by White and Negro pupils tested in grades 6, 8, 10, and 12.*

As an experimental control, Dr. Osborne matched the cards of all white and Negro pupils of the same chronological age who had equal mental ability at the sixth grade level in 1954. Noticeable differences appeared at the eighth grade level and increased thereafter. In the tenth and twelfth grades the differences in test performance between white and Negro members of the control group ranged from one to two grade placement years even though Dr. Osborne had found it necessary to select his subjects originally from the lowest quartile of the white pupils and the highest quartile of the Negro pupils in order to match a sufficient number of children to give a reliable result. Confirming the pattern of the unmatched Negro group, reading achievement differences were less for the Negro in this group than his much greater variation in arithmetic.

Dr. Osborne stated that the differences in student capacity shown by these test results were of major importance in educational planning as they indicate the necessity for changing course content, subject selection and rate of progress planning separately for each of the two groups if the schools are to endeavor to adapt to the different learning potentials of each.

The intervenors then called to the stand Dr. Henry E. Garrett, Visiting Professor of Psychology at the University of Virginia and Emeritus Professor of Psychology at Columbia University where he was the head of the Department of Psychology and taught for more than 30 years. Plaintiffs conceded that the opinions of Dr. Garrett were authoritative in his field of experimental and differential psychology. Dr. Garrett stated that the test differences which Dr. Osborne reported in Savannah-Chatham County were of approximately the same order as those observed and reported in the nation as a whole including both Northern and Southern schools.[2] At this point in the trial further testimony on this point became unnecessary as plaintiffs' counsel conceded that the described differences do exist between achievement levels of white and Negro pupils.

On the educational importance of learning rate variations of the magnitude shown to exist between white and Negro school children Dr. Garrett testified that the differences are greater than can be effectively spanned in a single class. To attempt to cover such a range of abilities would make it necessary to either drop the achievement level of the mixed class to the point where the white children were not being educated or holding the class level up where the Negro students would be frustrated by a program moving faster than their ability to learn.

Dr. Garrett pointed out that it is psychologically predictable that school failure is a source of frustration and will be compensated for by anti-social class behavior. He stated that the results predicted for a class made up of two groups of different learning rates would be quite similar to the classroom conditions reported in the District of Columbia schools following their integration in 1954.[3] The necessity for such differentiation is greatest at primary and secondary school levels where separate schooling has distinct educational advantages, lessening at collegiate and higher levels.

Dr. Garrett then gave his opinion that the differences in educability between Negro and white children were inherent, and that only minor changes could be achieved by educational readjustment or other environmental change. There was no scientific possibility that learning rate differences of the degree shown by Dr. Osborne's tests and the confirming national studies were either caused by or could be substantially altered by the students' environment.[4] In support of this thesis Dr. Garrett described tests of white and Negro groups where social and environmental factors had been equated without changing the results,[5] and cited the larger percentage of individuals of

2. Shuey, Audrey M., 1958. The Testing of Negro Intelligence. Lynchburg, Virginia: J. B. Bell.

3. House of Representatives, Eighty-fourth Congress, Second Session 1957. District of Columbia Subcommittee to Investigate Public School Standards and Conditions, and Juvenile Delinquency in the District of Columbia, "Investigation of Public School Conditions."

4. Garrett, Henry E. 1960. "Klineberg's Chapter on Race and Psychology: A Review." The Mankind Quarterly. Vol. I No. 1.
Burt, Cyril. 1958. "The Inheritance of Mental Ability." The American Psychologist. Vol. 13 No. 1, pp. 1–15.

5. McGurk, Frank C.J. 1956. "A Scientist's Report on Race Differences." U.S. News & World Report. Sept. 21, 1956, pp. 92–98.

Shuey, Audrey M. 1942. "A Comparison of Negro and White College Students by Means of the American Council Psychological Examination." Journal of Psychology. Vol. 14, pp. 35–52.

Garrett, Henry E. 1962. "The SPSSI and Racial Differences." The American Psychologist. Vol. 17, pp. 260–263.

Tanser, H. A. 1939. The Settlement of Negroes in Kent County, Ontario, and a Study of the Mental Capacity of their Descendants. Chatham, Ontario: Shepherd Publ.

Kennedy, Wallace A.; Van De Riet, Vernon; White, James C. 1961. "The Standardization of the 1960 Revision of the Stanford-Binet Intelligence Scale on Negro Elementary-School Children in the Southeastern United States." U.S. Dept. of Health, Education and Welfare, Office of Education, Cooperative Research Branch Project 954.

mixed inheritance in the higher score areas of Negro testing. On this genetic or inheritance basis of ability patterns, the witness further referred to studies made over a 35-year period in Wilmington, North Carolina, showing identical nineteen point Negro-white student test differences in 1925 and 1960 despite intervening improvement of the economic and educational conditions of the Negro families of that city.

The next witness was Dr. Wesley Critz George, Emeritus Professor of Histology and Embryology in the School of Medicine at the University of North Carolina. Dr. George confirmed Dr. Garrett's opinion that the variations in intellectual abilities between Negro and white students were innate and described them as being functionally related in both a quantitative and qualitative degree to physical characteristics which are anthropologically accepted as distinctive variances between the two races. The morphological distinctions referred to were differences in size, proportion and structure of the brain and endocrine systems which, within scientific limitations, compel predictable differences in personality and learning capacity of the type shown in the test results reported by Dr. Osborne and Dr. Garrett.[6]

It was Dr. George's opinion that the genetic basis of variations in educability is confirmed by the identical test results shown by random groups and selected groups matched for social and other environmental factors. In terms of the issue before this Court, his testimony indicated that no change of instructional program such as remedial classes could equate the two groups for subsequent parallel or combined school progress.

Intervenors then produced Dr. Ernest van den Haag, a Professor of Social Philosophy at New York University and lecturer on sociology and social philosophy at the New School for Social Research. As with the other witnesses presented by the intervenors, plaintiffs conceded that Dr. van den Haag was an authority in his field. This witness reviewed for the Court a number of educational studies which investigated sources of group conflicts in the classroom and the patterns of association among students which affect their educational achievement.[7] These studies, in whose conclusions Professor van den Haag concurred, show that inter-racial associational distinctions arise spontaneously in pre-school children without regard to whether they live in an area of segregated or integrated schooling.[8] This is one aspect

6. Coon, Carleton S. 1962. The Origin of Races. N. Y.: Alfred A. Knopf.

Gates, R. Ruggles, 1946. Human Genetics. N. Y.: The Macmillan Co. Vol. II., pp. 1137, 1138 and 1139.

Connolly, Cornelius J. 1950. External Morphology of the Primate Brain. Springfield, Illinois: Charles C. Thomas.

Peale, Talmadge, 1961. The Neuro-Anatomical Basis for Clinical Neurology.

Bean, Robert B. 1906. "Some Racial Peculiarities of the Human Brain." American Journal of Anatomy. Vol. 5, pp. 353–432.

Penfield, Wilder and Rasmussen, Theodore. 1957. The Cerebral Cortex of Man. New York: The Macmillan Co.

7. Lundberg, George A. 1952. "Selective Association Among Ethnic Groups in a High School Population." American Sociological Review. Vol. 17, No. 1, pp. 23–35.

Goodman, Mary E. 1946. "Evidence Concerning the Genesis of Interracial Attitudes." American Anthropologist. Vol. 48. No. 4, pp. 624–630.

Clark, Kenneth B. and Clark, Mamie. 1952. "Racial Identification and Preference in Negro Children." in Readings in Social Psychology. New York: Henry Holt and Co., pp. 551–560.

Davis, Allison. 1943. "Racial Status and Personality Development." The Scientific Monthly. Vol. 57, pp. 353–360.

Hill, Mozell C. 1946. "A Comparative Study of Race Attitudes in the All-Negro Community in Oklahoma." Phylon. Vol. 7, No. 3, pp. 260–268.

Pugh, Roderick W. 1943. "A Comparative Study of the Adjustment of Negro Students in Mixed and Separate High Schools." Journal of Negro Education. Vol. 12 No. 4.

Stember, Chas. H. 1961. Education and Attitude Change. New York: Institute of Human Relations Press.

8. Dr. Kenneth B. Clark, NAACP psychologist wrote on pre-schoolers in 1939:
"In general, the tendency to identify with either the colored or the white boy seems to approximate a chance frequency among those negro children in nurs-

of group identification which every individual makes. Such identifications occur by sex, profession, interests or other common characteristics. Among children, such identification is strongest in areas involving visual distinctions and between Negro and white infants takes the form of racial preference in group association. Such group selection continues into and through the primary and secondary school ages gradually becoming less compelling thereafter as the individual matures.[9]

According to this witness, any group having self-identification or associational preference closes its ranks in the presence of other groups. Prejudices, whether ethnic, religious or racial, increase rather than decrease in proportion to the degree of non-voluntary contact between separately identifiable groups. This is a psychological phenomenon which was noted in the time of Periclean Greece. Studies made of actual intermixing of groups in classrooms confirm the predicted result that an increase in cross-group contacts increases pre-existing racial hostility rather than ameliorates it. This group tension effect is greatest

> ery schools where there are both white and colored children, while a trend toward identifying with the colored boy is more pronounced in the negro children in the semi-segregated group and even more so in the all-negro nursery schools."
>
> Segregation as a Factor in the Racial Identification of Negro Pre-School Children: A Preliminary Report; Jour. of Exper. Educ. Vol. VIII, No. 2, Dec. 1939.

9. Radke, Marion; Sutherland, Jean; and Rosenberg, Pearl. 1950. "Racial Attitudes of Children." Sociometry. Vol. 13 No. 2, pp. 154–171.
   > "The white children in all situations and at all ages express strong preference for their own racial group. This is particularly the case when the choice is between negro and white children."
   > Hofstaetter, P.R. 1951. "A Factorial Study of Cultural Patterns in the U.S." Journal of Psychology. Vol. 32, p. 105.

10. On comparative educational results from homogenous and mixed classes, counsel for plaintiffs in this case, Jack Greenberg, in his book, "Race Relations in American Law" (1960) wrote that 2.5–

where obvious group identity criteria exist, such as physical appearance or variations in learning rate. Such groupings prevent a class having a natural homogeneity, multiply disciplinary problems in the classroom, and decrease attention to study.[10]

Dr. van den Haag stated that acceptable group identifications are essential to the well-being of the individual. Any attempt to de-identify one's self with a natural grouping would be harmful. As to the nature of the resulting injury, Dr. van den Haag quoted from Professor Gustav Ichheiser of the University of Chicago that:

> " * * * if the negroes would refuse to identify themselves consciously with other negroes as a subgroup, then they would. develop a kind of collective neurosis as to other minorities, too, for the conscious 'we' would in case of such an attitude be persistently in conflict with the unconscious 'we' and this inner split would inevitably reflect itself in different pathological distortions of the negro personality." [11]

*TOTAL BULLSHIT! AARGH!*

4.4% of negro high school graduates in Southern separate schools attained national college admission standards whereas in a survey of 50 leading Northern integrated high schools having a 30% negro enrollment, less than .2% of negro graduates could meet these scholarship standards. This effect on negro education of mixed schools is confirmed by Dr. Kenneth B. Clark, NAACP psychologist who recently said:

> "The bulk of the negro youngsters who are being turned out of these segregated Northern schools are functional illiterates. They have not been taught to read or speak well, they are deficient in arithmetic." (U. S. News & World Report, 6–10–63, p. 39)

Dr. Clark's reference to these mixed schools as "segregated" arises from his further contention that there is in those schools a "de facto segregation equal to that which exists in the South." Dr. Clark in the interview suggested special remedial classes for negroes in Northern schools, in effect a suggestion of resegregation as an educational necessity.

11. Ichheiser, Gustav. 1949. "Sociopsychological and Cultural Factors in Race Re-

A further conclusion of Dr. Ichheiser was described as being that the aim of Negro education should be to strengthen the degree to which Negroes identify with their own sub-group rather than with other groups.

This principle was considered by the witness in its application to special or selective transfers from one identifiable student group to another. This affects the question whether superior Negro students sufficiently above the general average of their group to have the intellectual capacity to meet the progress rate of the white classes should be transferred to the latter. Where such individuals are a small percentage only, the increase in interracial contact is insufficient to compel any substantial change in the disciplinary pattern of the classroom or in the attitude of the majority student group. The problem from the standpoint of psychological and educational injury is the problem of the Negro student who is transferred and those of his race who cannot meet the transfer standard.

As to the individual, Dr. van den Haag testified that the sense of achievement essential to a healthy personality in a superior pupil is caused by excelling in a group with which he has a strong identification. This is limited or destroyed by placing him in a group with which such identification is lacking and whose progress rate is such as to diminish his own relative accomplishment. Additionally a pathological disturbance of the type described by Dr. Ichheiser occurs through the conflict between the transferred student's deep identification with other Negro children and the simultaneous necessity of attempting to identify with a student group which could not be expected to accept him.

Dr. van den Haag testified that the effects upon the slower Negro group would be even more serious than the injury to the transferred individual. Such children would be deprived of the natural leadership of their group, would lose a sense of group achievement, be subjected to a demoralizing sense of rejection and with the consequent drop in their achievement level would suffer feelings of inadequacy or inferiority. Such a selective sifting would heighten any existing contrast between the two groups in the minds of each and substitute a definite superior-inferior comparison for the naturally occurring negro-white consciousness.

The conclusions of Drs. Garrett and van den Haag as to the psychological results of academic frustration in Negro-white classes was confirmed by the experience of the witness Dr. Clairette P. Armstrong, for some years Psychologist of the Childrens Court in New York and previously on the staff of the Chief Psychologist at Bellevue Hospital in that City. Dr. Armstrong's clinical work with delinquent boys revealed that one-third of all Negro truants gave inability to keep abreast of their school work as the reason for their running away from home.[12]

Dr. Armstrong's conclusion on the basis of her work with disturbed children was that a classroom organized around a socially homogenous group of children having relatively similar learning rates could noticeably diminish the incidence of truancy and decrease attention diverting anti-social incidents.

Intervenors proffered three additional scientists whom they had brought to court but when plaintiffs' counsel announced that they would submit no evidence in contradiction of the existing proof, these witnesses were withdrawn as cumulative.

lations." The American Journal of Sociology, Vol. 54, No. 5, pp. 395–399.

12. Armstrong, Clairette P. 1932. 660 Runaway Boys: Why Boys Desert Their Homes. Boston: Gorham Press. p. 208. 1945, "A Note on the Attainment of Delinquent Boys." School and Society. Vol. 61, pp. 29–32. 1945. "Some Comparisons of Negro and White Delinquent Boys." Journal of Genetic Psychology, Vol. 67, pp. 81–84. 1937. "A Psychoneurotic Reaction of Delinquent Boys and Girls." Journal of Abnormal Social Psychology. Vol. 32, pp. 329–42.

The proofs closed, plaintiffs renewed their objection of irrelevancy and moved to strike the evidence submitted by intervenors. The plaintiffs' position is not unambiguous. During trial plaintiffs' counsel conceded that such evidence could be admissible at a trial on the merits of these issues, but although the Court stated that this was a trial, counsel insisted that in their opinion nothing more was being heard than plaintiffs' motion for a preliminary injunction. Apparently plaintiffs abandoned this position at some later time and the Court assumes, for the purposes of the present opinion that the objection taken is to all evidence tending to show injury caused by, or educational advantages of, separate schooling for Negro and white children in Savannah-Chatham County.

In stating the basis for the objection to this evidence, counsel for plaintiffs said:

" * * * the law is settled by the Supreme Court in the Brown case that segregation itself injures negro children in the school system. That is what the Supreme Court's decision is all about, so we do not have to prove that."

A ruling on plaintiffs' objection therefore made it essential to consider the legal parameters of the Supreme Court's Brown decision.

**Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)**

**I**

The binding effect of any decision is legally a problem of privity of party or precedent, of prior adjudication or estoppel. Under the principles of *res judicata* and *stare decisis* fall most of the rules which govern these concepts.

■ As to parties and privies the final decision in Brown or in any court of final jurisdiction is *res judicata*, that is to say it is a conclusive adjudication as to all questions determined by the Court, whether of law or of fact. Kessler v. Eldred, 206 U.S. 285, 27 S.Ct. 611, 51

L.Ed. 1065; Hart Steel Co. v. Railroad Supply Co., 244 U.S. 294, 37 S.Ct. 506, 61 L.Ed. 1148; Hale v. Finch, 104 U.S. 261, 26 L.Ed. 732; Hansberry et al. v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22; Kean v. Hurley, 8 Cir., 179 F.2d 888; 28 U.S.C.A. Rule 65(d).

The general principles are set forth by Mr. Justice Stone in Hansberry v. Lee:

"It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in *personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process. Pennoyer v. Neff, 95 U.S. 714 [24 L.Ed. 565]; 1 Freeman on Judgments, (5th ed.), § 407. * * * and judicial action enforcing it against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments requires." (311 U.S. p. 40, 61 S.Ct. p. 117)

"To these general rules there is a recognized exception that, to an extent not precisely defined by judicial opinion the judgment in a 'class' or 'representative' suit, to which some members of the class are parties, may bind members of the class or those represented who were not made parties to it." (311 U.S. p. 41, 61 S.Ct. p. 118)

However, for one to be bound in a "class" suit, "adequate representation" is an absolute essential. On that point Mr. Justice Stone continued:

"It is familiar doctrine of the federal courts that members of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present, or where they actually participate in the conduct of the litigation in which members of the class are present as parties, * * * or where the interest of the members of the class, some of whom are present as parties, is joint, or where

for any other reason the relationship between the parties present and those who are absent is such as legally to entitle the former to stand in judgment for the latter." (311 U.S. p. 42, 61 S.Ct. p. 118)

■ Since intervenors were not parties to nor members of any class represented by defendants in Brown, it follows that Brown does not bind them under the doctrine of *res judicata*.

■ While *res judicata* applies to decisions of both law and fact, *stare decisis* is applicable only on questions of law and relates generally to all causes subsequently arising in the same or an inferior court. It applies as well to strangers as to privies. 21 C.J.S. Courts §§ 188, 212, pp. 305, 386; 14 Am.Jur. 290. Under this principle therefore this Court is bound by the decision in Brown v. Board of Education to the extent that it states rules of law. It has no application to any determinations of fact in that case. Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118; Commissioner of Internal Revenue v. Jergens, 127 F.2d 973 (5th Cir.).

In the case of Quon v. Niagara Fire Ins. Co. of New York, 190 F.2d 257, 260, the rule was stated by the Ninth Circuit Court of Appeals in this way:

"* * * the judgment of fact of one court on a particular record cannot bind another court, or even the same court, to make a similar finding on a different record. The imponderables such as credibility and inferences crowd upon one judging of facts."

In Partos v. Pacific Coast S.S. Co., 9 Cir., 95 F.2d 738, 742, the same court aptly illustrated the rule:

"Even if, on the identical complicated probative facts and contradictory testimony in another case * * *, another court found seaworthiness as an ultimate fact, it would not prevent us from weighing the evidence and making the contrary finding."

## II

It is therefore apparent that the governance of the present issues by Brown is the question of whether the applicable portion of the determination in that case —the injury occurring through segregation as plaintiffs put it—is a finding of fact or a conclusion of law. For this let us look to the words and record in Brown.

Several courts which have previously considered this question have concluded that the decision in Brown is in large part based on questions of fact contained in four case records before the Supreme Court. Taylor v. Board of Education of City School Dist. of City of New Rochelle, D.C., 191 F.Supp. 181 (1961); Calhoun v. Members of Board of Education of Atlanta, D.C., 188 F.Supp. 401, 409 (1959); Frasier v. Board of Trustees of North Carolina University, D.C., 134 F. Supp. 589, 592 (1955).

In Brown the Supreme Court stated for itself the nature of its inquiry:

"We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities?" (347 U.S. p. 493, 74 S.Ct. p. 691)

Although it would appear sufficiently clear on its face that this calls for a conclusion of fact rather than law, we are confirmed when we find that Court looking to the testimonial and other evidence in the records before it and to a submission of scientific opinion rather than seeking the answer to this question in the law books.

From the Kansas record, the Court read:

"* * * the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental

development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system."

These are facts, not law. To make these findings the Kansas District Judge considered evidence—not cases. Whether Negroes in Kansas believed that separate schooling denoted inferiority, whether a sense of inferiority affected their motivation to learn and whether motivation to learn was increased or diminished by segregation was a question requiring evidence for decision. That was as much a subject for scientific inquiry as the braking distance required to stop a two-ton truck moving at ten miles an hour on dry concrete.

Again, the Supreme Court quoted the record that Negro children in Delaware were "receiving educational opportunities which are substantially inferior to those available to white children otherwise similarly situated," (Ftn. 10, p. 494 of 347 U.S., p. 691 of 74 S.Ct.) a statement which could only be of factual rather than legal significance.

The Supreme Court put at rest any residual question on the nature of its inquiry when it indicated its reliance on scientific information:

"Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, [163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256,] this finding is amply supported by modern authority." 347 U.S. 494, 74 S.Ct. 692)

The teachings of psychology in 1896, in 1954, or in 1963 are inquiries requiring evidence in the same sense as repeated determinations of "seaworthiness." Actually, the non-legal authority to which the Court referred was neither testimonial nor documentary in character but came from a "Brandeis" type brief filed directly in the Supreme Court by the National Association for the Advancement of Colored People. The possible significance of this authorship is considered in the next point.

It was only after marshalling these facts and considering the statements of "modern authority" that the Court came to the conclusion that the minor Negro plaintiffs in those cases were injured by segregation and thereby "deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment." (347 U.S. p. 495, 74 S.Ct. p. 692)

█ The Court holds that the existence or non-existence of injury to white or black children from integrated or segregated schooling is a matter of fact for judicial inquiry and was so treated in Brown.

The factual nature of the finding of injury through segregation in Brown opened the door to the proof which intervenors have made in this case and plaintiffs' objection was overruled.

### III

Even though this Court would, in the usual case, feel justified if not constrained at this point in accepting without further review the uncontroverted testimony on scientific issues given as the unanimous opinions of conceded authorities open to cross-examination on the witness stand, the Court is not unaware that the Brown findings on the issue of injury are to the contrary of this evidence. Some inquiry is therefore indicated as to the possible reasons for this apparent disagreement of psychological authority.

The scientific testimony in the records before the Supreme Court in Brown is exemplified by that of the witness Dr. Robert Redfield submitted in the underlying case of Briggs v. Elliott, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. There Dr. Redfield testified (p. 160 of Record):

"The conclusion, then, to which I come, is differences in intellectual capacity or in ability to learn have not been shown to exist as between negroes and whites, and further, that the results make it very probable that if such differences are later shown to exist, they will not prove to be significant for any educational policy or practice."

That statement is directly contrary to all of the proof in the present case and to all of the studies which have been called to the Court's attention by intervenors. It is difficult for the Court to believe that when Dr. Redfield swore that differences in intellectual capacity or ability had not prior to that time been shown to exist as between Negroes and whites, he could have been unaware of such contemporaneous common references on the subject as the Encyclopedia Britannica (14th Ed.). There, in the article on "Differential Psychology" a number of studies on the subject are referred to, all to the effect that the variations shown in this case did exist. The quoted portion of Dr. Redfield's statement indicates he may not have been altogether unaware of the contradiction between his testimony and the state of public knowledge in his field at that time. As to Dr. Redfield's conclusion as to the absence of educational significance of any variation yet to be shown, the statement is at best speculative. The gross differences now shown are of obvious educational significance apart from the supporting testimony to that effect.

The Court is not aware of any other source of information placed before the Court in Brown which referred either to the existence of such differences or to their educational significance.

More directly, in the present case Mrs. Motley, trial counsel for these plaintiffs and, as the Court is given to understand, one of the NAACP legal assistants for plaintiffs in the Brown proceedings, has conceded on this record that the Negro-white learning rate differences described by Drs. Osborne and Garrett do exist in fact. In this respect certainly the present case differs in its facts from Brown and it is from this fact that serious educational considerations arise.

The Supreme Court in Brown also had placed before it statements by scientists

that separate schooling caused psychic injury to the Negro child. Here again the evidence in this case shows the contrary to be the fact. In this case, each witness testified that no such injury had been observed by him and in fact a dual school system is more favorable to the children involved in a psychological sense, avoids the injurious conflict arising from loss of racial identity, and results in a more successful educational program for the students of both races.

The Supreme Court in Brown referred to the current state of "psychological knowledge" as the basis for its finding of injury from separate schooling. It footnoted this statement with a number of references which were reviewed in this case by Dr. van den Haag. He pointed out that one of the items, "Personality in the Making" contradicted the conclusion for which it was cited and that others were either written by or relied on Dr. Kenneth B. Clark who also appeared in person as a witness in the Brown case on the same issue. Not only was Dr. Clark the first authority cited by the Supreme Court in the footnote (11) but he was the only witness in that case who testified on the basis of tests conducted by himself.[12]

Apart from various experimental fallacies described as scientifically invalidating Dr. Clark's conclusions as to injury from segregation, the Court considers most significant testimony that the test on which Dr. Clark relied for much of his oral testimony, and conclusion in Brown, was a test of only 16 children in a segregated school area showing a result directly contrary to an earlier test of 300 children in both separate and mixed schools. It was further stated that Dr. Clark had made the later test and limited it to 16 selected children for the purpose of affording a basis for his conclusions in Brown.

On the earlier test Dr. Clark had expressed a much more detailed opinion:

12. Ross and van den Haag, The Fabric of Society (1957), 163-66.
    Van den Haag, Ernest, Social Science Testimony in the Desegregation Cases.

A Reply to Kenneth Clark, Villanova L. R., Vol. 6, No. 1 (Fall, 1960).

"The children in the northern mixed school situation do not differ from children in the southern segregated schools in either their knowledge of racial differences or their racial identification.

"The southern children in segregated schools are less pronounced in their preferences for the white doll [i. e., less injury from loss of racial identity] as compared to the northern unsegregated children's definite preferences for this white doll. Although most are in the minority, a higher percentage of the southern children, compared to the northern children, prefer to play with the colored doll and think that it is a nice doll."

And, describing the mental disturbance, which is the type of injury with which both the Supreme Court and this Court are principally concerned, Dr. Clark confirmed the results predicted by Dr. Ichheiser:

"* * * some of the children who were free and relaxed in the beginning of the experiment broke down and cried or became somewhat negativistic during the latter part when they were required to make self-identifications. Indeed, two children ran out of the testing room, unconsolable, convulsed in tears. This type of behavior, although not so extreme, was more prevalent in the North than in the South. The southern children generally indicated their disturbance by smiling or matter of factly attempting to escape their dilemma either by attempted humor or rationalization." (from "Racial Identification and Preference in Negro Children," see footnote 7, supra)

The Court is inclined to accept this earlier scientific opinion of Dr. Clark not only because of the broader test basis used but because it is directly confirmed by all the evidence presented in this case.

The National Association for the Advancement of Colored People furnished representation for plaintiffs both in the Brown cases and in this case. The Court is advised that both Dr. Redfield and Dr. Clark were employed or retained either regularly or occasionally by that organization. Plaintiffs were aware from intervenors' papers of the nature of the intended contradiction of the earlier testimony of these two scientists. Presumably, plaintiffs could have shown supporting authority on this point had they wished. The Court must assume that the truth here lies on the side of the evidence of injury given in this case rather than that given in Brown.

In the Exhibit "Hearings before a Subcommittee of the Committee on the Judiciary, United States Senate," 87th Congress, 2nd Session, pp. 166–178, appears a speech made by Dr. Alfred H. Kelly of Wayne State University in which he described in some detail how he helped to present the Brown case to the Supreme Court. In part he said:

"It is not that we were engaged in formulating lies; there was nothing as crude and naive as that. But we were using facts, emphasizing facts, bearing down on facts, sliding off facts, quietly ignoring facts, and above all interpreting facts in a way to do what [Thurgood] Marshall said we had to do—'get by those boys down there.'"

The Supreme Court has on other occasions itself withheld or recalled earlier determinations where evidence had been shown to have arisen more from the necessities of counsel than the compulsion of fact. Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; Shawkee Mfg. Co. v. Hartford-Empire Co., 322 U.S. 271, 64 S.Ct. 1014, 88 L.Ed. 1269. See also 28 U.S.C.A. rule 60.

█ The Court accordingly accepts the evidence given in the present case as having somewhat stronger indicia of truth than that on which the findings of potential injury were made in Brown.

### Reasonable Classification

Finally, even though the Court accepts intervenors' proof, it still must an-

swer the question whether racial traits of compelling educational significance constitute a reasonable basis for classification under the police power of the State within the limitations of the Fourteenth Amendment to the Constitution.

Both before and since Brown the Supreme Court has consistently adhered to the principles laid down in Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369, more recently quoted and followed by the Court in Morey v. Doud (1957) 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485, which is here quoted because of its clarity:

"1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79 [31 S.Ct. 337, 240, 55 L.Ed. 369]."

Among the many cases stating and applying those well known classification rules under the Fourteenth Amendment are, Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961); McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961);

Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

In the latter case, decided before Brown, Mr. Chief Justice Warren pointed out that race and color may serve as a convenient index for differentiating between groups. Continuing, he said:

"Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated."

Two weeks later the same Court and Judge in Brown did not hold that it is a violation of the equal protection clause to separate Negro children from white children, *per se.* What it did hold was that under the facts in the records before the Court it was a violation of the equal protection clause to separate whites and Negroes *"of similar age and qualifications solely* because of their race." (347 U.S. p. 494, 74 S.Ct. p. 691)

Writing two years after Brown, Mr. Justice Douglas recognized the legal importance of the distinction between race as such and a racial trait saying in his book "We the Judges" that "regulations based on race may * * * be justified by reason of the special traits of those races." (p. 398)

Similarly, the Court of Appeals of this Circuit, noting the absence of any relevant criteria for racial separation in Orleans Parish School Board v. Bush, 242 F.2d 156 (1957) specifically called attention to the lack of evidence of "any reasonable classification of students according to their proficiency or health * * *."

In this case that lack has been supplied and the Court holds that a classification based on racial traits directly concerned with proficiency and mental health is a reasonable one within the intendment of the equal protection provisions of the Constitution.

On the law these pupils of both races in Savannah-Chatham County are entitled to the best education available and on the unassailable facts that education is best given in separate schools adapted to their varying abilities. On the mandate of that law this Court gives judgment dismissing the complaint.

## FINDINGS

### The Parties

1. The minor plaintiffs are Negro students in primary or secondary schools of Savannah-Chatham County. The minor intervenors are white students in the primary or secondary white schools of Savannah-Chatham County. The defendant Board of Education and the individual defendants are in control of and administer the primary and secondary public schools in Savannah-Chatham County and have the necessary authority to place in effect any orders of this Court with respect thereto.

### The Schools

2. The primary and secondary public schools of Savannah-Chatham County are divided into schools for white pupils and schools for Negro pupils and admission thereto is limited to applicants of the respective races.

3. The teaching and administrative staffs of the white and Negro schools are white and Negro respectively up to and including the direct assistants to the Superintendent of Schools. Principals of both Negro and white schools are part of the Superintendent's staff and participate in the adaptation of their particular schools to pupil requirements and the educational effectiveness of the several parts of the school system. The schools are equal in all respects except as to a slight advantage in favor of the Negro teaching staff in terms of graduate training and salaries. The same total curriculum is made available to all schools. Responsiveness to the aptitudes and needs of the pupils in each is secured by arranging a choice of elective subjects to be selected by the school on the basis of student request and guidance counseling.

### Student Test Grouping

4. All pupils in three significant grades of the Savannah-Chatham County school system have been tested annually since 1954 for psychometric intelligence and correlative academic achievement through a battery of nationally accepted tests administered by local personnel, supervised and processed by the University of Georgia. This program was initiated prior to May, 1954 at the request of the Superintendent of Schools for Savannah-Chatham County as part of a comprehensive study of mental growth and school achievement for pupil placement and course selection and content recommendations. The result of this testing program has been considered by the Savannah-Chatham County Board of Education in arranging school curricula responsive to the abilities and learning characteristics of the two student groups.

5. The psychometric test results have conclusively demonstrated that the differences between white and Negro students in learning capabilities and school performance vary in increasing degree from the pre-school period through the completion of high school. The differences between white and Negro students were consistent on all types of tests and increased with chronological age at a predictable and constant rate. The Negro overlap of the median white scores dropped from approximately 15% in the lowest grades to 1–2% in the highest and indicated that the Negro group reached an educational plateau as much as four years before the white group. When a special control group was selected for identity of age and intelligence quotient in the lower grades, the Negro students lagged by two to four years when the entire group reached the 12th grade.

6. The tests covered general intelligence, reading and arithmetic achievement, and mental maturity. On the last, the white average was 22 points above the Negro average. The achievement tests showed major ability pattern differ-

ences. On reading comprehension and arithmetic fundamentals there was virtually no overlap between the two groups.

## Basis of Test Variations

7. These differences in test results in Savannah-Chatham County are not the result of the educational system or of the social or economic differences in status or in environment of the students. These test results agree on a point for point basis with substantially identical results obtained from similar tests made in other areas of this country and abroad and in both segregated and integrated situations. Additionally, quantitative and qualitative distinctions in Savannah-Chatham County and other test results have shown the same variation in learning rates between the two ethnic groups even after the socio-economic factors of the test students had been equated.

8. All the evidence before the Court was to the effect that the differences in test results between the white and Negro students is attributable in large part to hereditary factors, predictably resulting from a difference in the physiological and psychological characteristics of the two races. The evidence establishes and the Court so finds that of the twenty-point difference in maturity test results between Negro and white students in Savannah-Chatham County a negligible portion can be attributed to environmental factors. Furthermore no evidence whatsoever was offered to this Court to show that racial integration of the schools could reduce these differences. Substantially all the difference between these two groups of children is inherent in the individuals and must be dealt with by the defendants as an unchangeable factor in programming the schools for the best educational results.

## Group Integration

9. The students in Savannah-Chatham County schools are 60% white, 40% Negro. A school class mixed on this basis would have a median progress rate 12 points below that of the former white class, and 8 points above the progress rate of the comparable former Negro class. Two thirds of the Negro students would fail in this situation, particularly in the upper grades. This would place in the same schoolroom Negro students two to four years older in chronological age than the white students. White students in such a class lose any challenge to further academic accomplishment.

10. Failure to attain the existing white standards would create serious psychological problems of frustration on the part of the Negro child, which would require compensation by attention-creating antisocial behavior. In other cities this effect has created serious discipline problems for the teachers and school administrators with consequent loss of schooltime. In New York 37% of Negro truants questioned in a study stated that they had run away from home because of failure to keep up in school.

11. The congregation of two substantial and identifiable student groups in a single classroom, under circumstances of distinct group identification and varying abilities would lead to conflict impairing the educational process. It is essential for an individual to identify himself with a reference group for healthy personality development. Physical and psychological differences are the common basis of group identification, indeed they compel such self-identification. To increase this divisive tendency, it has been established without contradiction, that selective association is a universal human trait; that physically observable racial differences form the basis for preferential association and that patterns of racial preference are formed and firmly established at a pre-school age.

12. The effects of intergroup association are reasonably predictable on the basis of that branch of psychology known as social dynamics. In the case of two identifiable groups in the same classroom, intergroup tensions and conflicts result. These become substantial when the groups have a high identification index in a situation where the difference between them is as great as that existing between white and Negro children in the Savannah-Chatham County schools.

13. In each city referred to in the evidence where large scale integration had taken place or had existed continuously, the predicted level or even a greater degree of conflict existed and substantially impaired the efficacy of the entire educational system.

14. Total group integration as requested by plaintiffs would seriously injure both white and Negro students in the Savannah-Chatham County schools and adversely affect the educational standards and accomplishments of the public school system.

## Selective Integration

15. Throughout the trial, counsel for plaintiffs emphasized the conceded ability of certain superior Negro children to meet the progress norms of the white classes and implied that at least selective transfers of such students to white schools would not cause injury similar to the effects of group integration. The Court finds that such selective integration would cause even greater psychological harm to the individual Negro children involved and to the balance of their group.

16. Negro children so transferred would not only lose their right of achievement in their own group but would move to a class where they would be inescapably conscious of total social rejection by the dominant group. Such children must try to identify themselves with the white children while unable to free themselves from continuing identification with other Negro children. Additionally, the children involved, while able to maintain the rate of the white class at first, would, according to all of the test results, thereafter tend to fall further back in each succeeding term.

17. The effects on the remaining Negro children would be even more injurious. The loss of the better group members would greatly increase any existing sense of inferiority. The competitive drive to educational accomplishment for those not transferred would be taken away. The Court finds that selective integration would cause substantial and irremovable psychological injury both to the individual transferee and to other Negro children.

## Segregation Injury

18. Plaintiffs' assumption of injury to Negro students by the continuance of segregated schools is not supported by any evidence in this case. Whatever psychological injury may be sustained by a Negro child out of his sense of rejection by white children is increased rather than abated by forced intermixture, and this increase is in direct proportion to the number and extent of his contacts with white children.

19. Each study presented to the Court, confirmed by the opinions of the witnesses showed that the damaging assumptions of inferiority increase whenever the child is brought into forced association with white children. The principal author of the studies relied on by the Supreme Court in the Brown case came to the conclusion that compulsory intermixture rather than racial separation in school was the principal source of the damaging loss of race identification.

20. The adverse effects of compulsory congregation are particularly harmful in the early formative school years. Intervenors' witnesses noted that the adverse effects of educational integration at higher levels lessens to some degree. The findings herein are limited to children of primary and secondary school ages.

## CONCLUSIONS

1. The white and Negro school children have equivalent rights before this court, and are equally entitled to be considered in determining the scope and content of constitutional rights.

2. A reasonable classification within the meaning of the equal protection clause of the Constitution would be one which secures the maximum result in the educational process for all students and the minimum injury to any.

3. The classification of children in the Savannah-Chatham County schools by division on the basis of coherent groups having distinguishable educability capabilities is such a reasonable classification.

## JUDGMENT

1. The injunction prayed for by the plaintiffs in this case is denied and the complaint is dismissed.

2. No costs are awarded to any party as against the other.

3. In dismissing the complaint, the Court leaves open to any of the parties or their privies the right to reopen for a further order at the foot hereof upon a showing that defendants fail to accord to either white or Negro children, as the case may be, the same degree of specialized instructional consideration as is given to the other.

4. Moreover, since this decision depends in large part on the substantial accuracy of the group differences reported by the University of Georgia on the basis of the annual testing of pupils in the Savannah-Chatham County schools, leave is granted to any party to apply to the Court for an order requiring that any such future test shall be taken or processed under any specific conditions reasonably adapted to insure that the results will be impartially conducted and reported.

5. Orders heretofore entered under mandate from the Court of Appeals with respect to a preliminary injunction remain of force and effect pending a prompt appeal from this decision on the merits.